Ben Waters v. E. H. East et al.

Decided April 14, 1900.

**Limitation and Laches—Action to Reform a Bond—Mutual Mistake.**

A bond of indemnity in the sum of $10,000 was so carelessly drawn that its con-
ditions were patently unintelligible and the contingency upon which it was to be-
come payable did not appear. The obligee could not read, but was a thrifty business
man of considerable property, and in the transaction had the assistance of his son
and son-in-law, the latter of whom read over the bond before its acceptance and
so criticised it as to excite inquiry as to its sufficiency. More than ten years there-
after the obligee, in whose possession the bond had remained from its date, brought
suit to reform the instrument and to recover thereon. Held, that as the case was
one of mutual mistake, and as no sufficient excuse for the failure to sooner dis-
cover the error and bring the suit was shown, the action was subject to the legal
defense of limitations and also the equitable defense of stale demand.

APPEAL from Tarrant. Tried below before Hon. IRBY DUNKLIN.

*Greene & Stewart* and *Johnson & Aiken*, for appellant.

*Capps & Canty*, for appellees.

STEPHENS, ASSOCIATE JUSTICE.—This suit was brought by Ben
Waters against E. H. East and the administrator of the estate of E. W.
Harrold to reform and recover upon a bond of indemnity executed by
East, as principal, and E. W. Harrold, as surety. From a judgment de-
nying recovery against the administrator of the Harrold estate, this ap-
peal is prosecuted. The administrator pleaded in bar of the action both
the statute of frauds and the statute of limitations.

The parties to the instrument (or rather E. H. East, as found by the
trial court, but with the consent of appellant) selected an inexperienced
deputy county clerk to draw it, who used a blank form of title bond as
a model. In the first part of the instrument the indebtedness to Waters
of East, as principal, and Harrold, as surety, in the sum of $10,000 was
expressly acknowledged, but in stating the condition upon which it was
payable, the interlineations and erasures were such as to render the rest
of the instrument unintelligible. It was, however, apparent from the
face of the entire instrument, not only that it was incomplete, but also
that the obligation was a conditional one. The contingency upon which
it was payable was not therein stated, but appellant had to resort to
parol to show it. If it had been treated and declared upon as an ab-
solute promise, the statute of limitations would have been a complete bar
to the action. If appellant had sought a recovery, without a reforma-
tion of the instrument, upon the conditional promise of indemnity, the
statute of frauds would have stood in the way. Rev. Stats., art. 2543.

The only course left was a suit in equity to reform the instrument,
and thus avoid the statute of frauds, and, if possible, the statute of
limitations. But while this suit was brought in less than four years
from the breach of the oral condition of indemnity as agreed upon, it

was not brought within four years "next after the right to bring the same" as a suit in equity to reform a written instrument had accrued, unless a sufficient excuse was shown for the delay. Rev. Stats., art. 3358; Starnes v. Beitel, 50 S. W. Rep., 202 (in which writ of error was refused); 2 Pom. Eq., secs. 862, 868, p. 331, note 3; Clark v. Gregory, 27 S. W. Rep., 56.

It is, however, insisted by appellant that he showed a sufficient excuse for not sooner discovering the mutual mistake and bringing the suit, but the court found against him on this important issue of fact, and we are not able, after a careful examination of the record, to say that the finding was not warranted by the evidence In order to avoid the statute of limitations in cases like this, where, through mutual mistake, the written instrument fails to express the real contract, and the party injured seeks to have it reformed, the burden is on him to show not only that he did not discover, but also that he could not by the use of reasonable diligence have discovered, the mistake in time to have brought the suit within the statutory period. Oldham v. Medearis, 50 Texas, 506, 39 S. W. Rep., 919, 40 S. W. Rep., 350, and cases there reviewed.

This suit was not instituted for more than ten years after the instrument sought to be reformed had been executed, and not until after one of the parties to it had died. Therefore, even in the absence of a statute of limitations, without a sufficient excuse for this delay, the action could not have been entertained in equity, since stale demand and laches would have barred it. The defect complained of was obvious and glaring, and although the instrument was in appellant's possession, he failed to discover such patent defect for ten or twelve years. True, he could neither read nor write, but he seems to have been a thrifty business man, who had accumulated a considerable estate, and had ample means to employ competent persons to attend to such matters for him. Besides, he had the assistance of his son-in-law, Mr. Harmison, and his son, B. W. Waters, in this very transaction, who, it seems, were both able to read and write. He did not pretend in his testimony that he had been the victim of fraud, and the court made an express finding against fraud, which is sustained by the evidence.

The case, then, must be treated as one of mutual mistake, in which it was incumbent on appellant to show by a preponderance of the evidence that he could not, by the use of reasonable diligence, have discovered the mistake sooner. As evidence tending to excite inquiry and to sustain the court's finding, we quote the following from the testimony of B. W. Waters: "I saw the bond after it was brought back from Graham. My brother-in-law and I were there. He was figuring a little about all going to hold together—figuring with my father and myself. I was sort of in it. The land was not bought for me. Harmison looked over the paper. He could read and write." Question: "He was advising your father, was he, about the land? You and he had been out there to look at the land?" Answer: "Yes; he was giving the best

description of the land he could. When East came back from Young County then Harmison looked over the papers and I looked over them. I saw the deed and the bond. East had signed the bond. I don't suppose my father had signed it. I could not say for certain, and do not recollect, who had signed the deed. I did not read the papers over. My brother-in-law was looking over them, and called my attention a time or two, and then he took the bond and deed and went in back. He found something he didn't like, and he asked East what 'this' meant, and they just laughed and said, 'A little error some way,' or 'scratch out some way,' and they did fix it over. I was a boy like, you might say, or a kind of youth, and I never paid much attention, only he looked at it and says, 'Why, it is fixed up,' but he says, 'What does this mean?' He sat down back there and East told him the bond was all right. 'We have made you a good bond; Mr. Waters will have no trouble.' That is about the conversation I recollect. I don't remember that my brother-in-law found something the matter with the bond. I suppose he did. He examined the bond some few minutes. Papa was sitting in there with East when he brought it back in. Harmison called my attention to it, too. He just—I suppose he did that, trying to see that my father was protected in the trade. I don't remember what it was that Harmison called my father's attention and mine to, but it was some little error that he imagined he saw there, and he stated that maybe it was not right. I don't suppose he scratched anything out of the bond up there. I didn't see him. Didn't see anybody scratch anything in order to correct that error. I don't know that I have seen the bond since."

On redirect examination he testified: "After the transaction between East and my father, they went to Graham in the morning, and I am most certain they came back that night and stayed all night. When Jack spoke in regard to the bond, East said in substance that he had made a little error in drawing the writing, and that was what Jack had noticed, and that it had been corrected. He said it was a good bond to secure my father against Archer County coming back on my father; that they would pay the land out; he gave the bond; it was a good bond; that he need not be uneasy about it; it was all right; he had the money then to pay it, if he could pay it, but he couldn't pay it under a certain length of time, several years. Says: 'You needn't never be afraid. This bond is all right. It is as good a bond as can be made in Texas.' Good bond to secure my father against any claims that Archer County might come in on for the land. Archer County couldn't come back on him for anything—or something to that. That was the night after the bond was made."

Appellant did not deny that he heard and noticed what his son thus detailed, nor did he offer any explanation in that connection. What a person of ordinary prudence would or would not do under given circumstances is peculiarly a question for the trial court, and if, as was held in Kuhleman v. Baker, 50 Texas, 636, the petition in that case was subject to demurrer because it failed to show sufficient diligence to discover

the alleged fraud, we are unable to see how we can overturn an express finding in this case of a want of diligence cn the part of appellant. On the contrary, we must sustain the finding that appellant failed to discharge the burden that rested upon him to show affirmatively that he used reasonable diligence to discover the defective condition of a ten thousand dollar bond which lay in his possession for more than ten years unnoticed, notwithstanding the circumstances tending to excite inquiry as shown in the testimony above quoted, and not explained by him. In line with the case above cited, see Cooper v. Lee, 75 Texas, 121; Norton v. Davis, 83 Texas, 34; Kennedy v. Baker, 59 Texas, 160; Railway v. Tittington, 84 Texas, 219; Stone v. Sledge, 24 S. W. Rep., 697; McKinney v. Rodgers, 29 S. W. Rep., 407; Smith v. Fly, 24 Texas, 345; Calhoun v. Burton, 64 Texas, 511; Railway v. Van Alstyne, 56 Texas, 449.

The assignments raising other questions have all been examined, but, being without merit, must be overruled.

We therefore adopt the court's conclusions of law and fact, and affirm the judgment.

*Affirmed.*

Writ of error refused.