RONALD LEE GILMAN, Circuit Judge.
This case involves the resolution of bankruptcy claims between Larbar Corporation, a highway contractor, and Kentucky Central Insurance Company (KCIC), its surety. In June of 1994, the trustee of Larbar’s bankruptcy estate filed suit seeking to avoid the late-filed security interest created by a 1989 Agreement of Indemnity between Larbar and KCIC. In response, KCIC claimed that (1) its security interest is not avoidable, (2) even if its security interest is avoidable, KCIC is nevertheless entitled to the receivables due Larbar under either the doctrine of equitable subrogation or a trust fund theory, and (3) it has the right to setoff the net profits it made on some of Larbar’s highway projects against the net losses it incurred on others.
Both the bankruptcy court and the district court held that KCIC’s security interest was avoidable, that it had waived its right of equitable subrogation, and that it • did not have the right of setoff. For the *442 reasons set forth below, we REVERSE the district court’s decision on both the equitable subrogation and setoff issues and REMAND the case for the entry of a judgment consistent with this opinion.
I.BACKGROUND
The facts in this case are undisputed. Larbar sought government contracts, both directly and as a subcontractor, to erect guardrails on highway projects in Kentucky. On May 15, 1989, Larbar entered into an Agreement of Indemnity with KCIC that was applicable to any surety bonds guaranteeing Larbar’s performance and payment obligations on construction projects that KCIC decided to underwrite in the future. In return, Larbar agreed to indemnify KCIC against any loss on the bonds. The agreement also required Lar-bar to assign to KCIC all of Larbar’s rights under any contract on which Larbar abandoned its obligations. For reasons not found in the record, KCIC did not record its security interest granted by this agreement until February 25,1993.
Between January of 1990 and October of 1991, Larbar entered into 29 contracts to erect guardrails at highway construction sites in Kentucky. In order to complete these projects, Larbar secured a loan from the Bank of Lexington & Trust Company (the predecessor to Liberty National Bank of Lexington and later Bank One) (hereinafter “the Bank”) on May 25, 1990. As part of the loan transaction, the Bank was granted a security interest in Larbar’s accounts receivable from a project in Harlan County, Kentucky with Incisa USA, Inc. (the “Incisa project”). At that time, Lar-bar as the subcontractor, Incisa as the general contractor, and KCIC as the surety executed an agreement (the “Side Agreement”) containing the following language:
1. Payments on the above Contract shall be made in the form of checks made payable jointly to the Bank of Lexington & Trust Company and Larbar Corporation.
2. Nothing contained herein shall amend or alter the prior Contract between the parties except as otherwise stated expressly in paragraph 1 above. Without limiting the generality of the foregoing, Larbar and Incisa agree that paragraph 13(f) of the Contract shall remain in full force and effect. Thus, Incisa pursuant to paragraph 13(f) may add a third party i.e. a supplier, laborer or materialman to the check in addition to Larbar and Bank of Lexington in the event that Incisa does not receive satisfactory evidence that said suppliers, laborers or materialmen are being paid.
3. Kentucky Central Insurance Company executes this Agreement for the limited purpose of affirming that the subcontractor’s Bond which it issued on January 19, 1990, to Larbar Corporation is unaffected by the terms of this Agreement and still remains in full force and effect.
The Bank never recorded its security interest relating to the Incisa project.
On March 3,1993, Larbar notified KCIC that it was unable to complete 13 of its construction contracts on which KCIC had obligated itself as surety. Larbar requested that KCIC assume responsibility for these projects. By letter dated March 4, 1993, KCIC informed Larbar that it would do so.
Larbar then filed a petition for relief under chapter 7 of the Bankruptcy Code on March 16,1993. Immediately following Larbar’s filing of bankruptcy, KCIC sought and obtained an order of abandonment on the 13 outstanding contracts. This order, dated June 15, 1993, stated that the contracts were “rejected,” and that KCIC was entitled to receive payments and make disbursements related to them. Pursuant to the order, KCIC completed work on the contracts using a replacement contractor. KCIC incurred substantial losses on most of these con *443 tracts, with the Incisa project being the only contract that created a significant net profit ($24,944.89).
In June of 1994, the trustee filed a complaint in the United States Bankruptcy Court for the Eastern District of Kentucky, seeking to avoid KCIC’s security interest created by the 1989 Agreement of Indemnity. In response, KCIC claimed that (1) its security interest was not avoidable because it gave new value on an unsecured basis for Larbar’s benefit after the filing of bankruptcy, (2) even if its security interest is avoidable, KCIC was nevertheless entitled to the receivables under either the doctrine of equitable subrogation or a trust fund theory, and (8) it had the right to setoff the net profits gained on some of the projects against the net losses incurred in its completion of others. Both parties filed motions for summary judgment.
On February 26, 1996, the bankruptcy court issued its Memorandum Opinion, holding that KCIC’s security interest was avoidable because it was perfected less than 90 days prior to Larbar’s filing of bankruptcy. See 11 U.S.C. § 547(b)(4)(A) (stating that a trustee may avoid a preferential transfer of a debtor’s interest in property made within 90 days before the debtor’s filing of bankruptcy). Second, the bankruptcy court determined that no express trust was created under applicable Kentucky law, and thus rejected KCIC’s trust fund theory. Third, it held that the 1990 Side Agreement constituted a waiver of KCIC’s right of equitable subrogation, so that any sums owed to Larbar on the Incisa project are to be applied to the Bank’s hen claim prior to being applied to KCIC’s hen claim. (Because the Bank’s hen was also unperfected, the trustee stands in the shoes of the Bank as to this claim.) Finally, the bankruptcy court held that because the equitable relief accorded a surety does not entitle the surety to any profit on a completed contract, KCIC could not setoff the profits gained on some of the contracts against the losses incurred on others. Instead, KCIC was ordered to remit these profits to the trustee.
KCIC appealed the bankruptcy court’s order to the United States District Court for the Eastern District of Kentucky. The district court affirmed the bankruptcy court’s order in its entirety, and later denied KCIC’s motion to alter or amend its judgment. This appeal followed.
II. ANALYSIS
A. Standard of review
“This court reviews rife novo the decision of the district court reviewing a grant of summary judgment by the bankruptcy court.” In re Constr. Alternatives, Inc., 2 F.3d 670, 674 (6th Cir.1993). The district court’s denial of a motion to alter or amend a grant of summary judgement is also reviewed rife novo by this court. See Columbia Gas Transmission, Corp. v. Limited Corp., 951 F.2d 110, 112 (6th Cir.1991).
B. Equitable subrogation
KCIC concedes on appeal that its lien rights created by the 1989 Agreement of Indemnity have reverted to the trustee because its security interest was belatedly perfected. Instead of relying on such lien rights, KCIC argues that it has a right to the proceeds earned on the various Larbar projects according to the doctrine of equitable subrogation. This doctrine arises when a contractor defaults on its obligations and a surety completes the work called for by the contract and pays all of the related bills. The law is clear that a surety under these circumstances has a right to the payments due the contractor to the extent of full reimbursement. See Pearlman v. Reliance Ins. Co., 371 U.S. 132, 141, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); Prairie State Bank v. United States, 164 U.S. 227, 240, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896). The surety has this right whether its bond is for performance or payment. See Pearlman, 371 U.S. at 139. Moreover, this right relates *444 back to the date of the surety’s issuance of the bonds for the contract. See Prairie State, 164 U.S. at 240; National Sur. Corp. v. United States, 118 F.3d 1542,1546 (Fed.Cir.1997). Under Kentucky law, a surety does not have to perfect its interest according to the Uniform Commercial Code in order to prevail on its claim of equitable subrogation. See National Sur. Corp. v. State Nat’l Bank of Frankfort, 454 S.W.2d 854, 356 (Ky.1970) (hereafter “Bank of Frankfort”).
The surety’s right of equitable subrogation takes precedence over any subsequently acquired security interest in any payments due the principal, which in the present case means that KCIC’s equitable rights would be superior to the Bank’s rights under the 1990 Side Agreement. See Prairie State, 164 U.S. at 240; Henningsen v. United States Fidelity & Guar. Co., 208 U.S. 404, 410, 28 S.Ct. 389, 52 L.Ed. 547 (1908). A surety, however, can waive this right in favor of another creditor. See, e.g., Bank of Frankfort, 454 S.W.2d at 357 (holding that the surety waived its right of equitable subrogation in favor of the lending bank).
None of the parties disputes the fact that KCIC fulfilled its obligations as a surety under all of the contracts that it bonded for Larbar and that, according to the doctrine of equitable subrogation, it has the presumptive right to full reimbursement. The parties differ, however, as to whether the 1990 Side Agreement constituted a waiver of this right in favor of the Bank as to the Incisa project.
Both the bankruptcy court and district court held that the Side Agreement constituted a waiver of KCIC’s right of equitable subrogation to payments due Larbar from Incisa. Unfortunately, neither court offered any detailed explanation for this holding. Rather, the bankruptcy court simply stated that KCIC acquiesced in the 1990 Side Agreement, and then analogized the present case to the Kentucky decision in Bank of Frankfort, 454 S.W.2d at 354. Upon appeal, the district court affirmed the bankruptcy court’s decision without any additional analysis.
The facts of Bank of Frankfort, however, are distinguishable from those in the present case. In Bank of Frankfort, the contractor notified the surety that it was unable to complete its contracts. The surety then took over the contractor’s projects. Because it determined that there were insufficient funds to meet the contractor’s weekly payroll obligations, the surety acquiesced in the contractor’s plan to obtain a bank loan to pay these expenses. See id. at 355. This occurred after the contractor’s default and the surety’s assumption of the projects. The Kentucky Court of Appeals stated that “the loan was obtained for the benefit of National Surety” and that the surety “did, in fact, receive full benefit of these funds and accordingly incurred the obligation to repay them.” Id. at 357. It therefore held that “the facts of this case do not make it one for equitable subrogation.” Id.
A similar conclusion was reached by the Kentucky Court of Appeals in Western Casualty & Surety Co. v. Meyer, 301 Ky. 487, 192 S.W.2d 388 (Ky.1946). In Western Casualty, a bank made a loan to the contractor after the contractor’s default on its contracts. The surety allegedly “encourage[d], advise[d], persuade[d] and urge[d]” the lender to advance the necessary funds to enable the contractor to complete its construction project. See id. at 389. The court stated that the obligations for which the loan was made had for all practical purposes become the liability of the surety, and that the surety therefore had waived its right of equitable subrogation. See id. at 393.
The facts of the present case are markedly different. Larbar obtained the bank loan three years prior to its default and KCIC’s assumption of the contracts. The loan was obtained solely for the benefit of Larbar, not KCIC. There was no immediate benefit to KCIC, because its obligation to take over the projects in the event of *445 Larbar’s default was purely contingent at that point. We thus conclude that neither-Bank of Frankfort nor Western Casualty is controlling under the facts of this case.
Furthermore, we find no language in the Side Agreement that constitutes a waiver of any of KCIC’s rights. The first paragraph of the agreement simply permits Incisa to issue payment checks to both Larbar and the Bank, thus giving the Bank the ability to ensure that Larbar would use these payments appropriately. Paragraph two states that “[n]othing contained herein shall amend or alter the prior Contract between the parties except as otherwise stated expressly in paragraph 1 above.” It further states that Incisa can add a third party to the check if the suppliers, laborers, and materialmen are not properly paid. The final paragraph, the only one that refers to KCIC, states that KCIC “executes this Agreement for the limited purpose of affirming that the subcontractor’s Bond ... is unaffected by the terms of this Agreement and still remains in full force and effect.” At no point does the agreement mention the right of equitable subrogation or any subordination of KCIC’s rights in the event of Larbar’s default. Given the significance of the right of equitable subrogation, we are unwilling to read a waiver of this right into the agreement absent some indication that such a waiver was intended by the parties.
For the all of these reasons, we hold that the 1990 Side Agreement did not constitute a waiver of KCIC’s right of equitable subrogation as to the Incisa project. We therefore reverse the decision of the district court on this issue.
C. Setoff
KCIC also claims that it has the right to setoff the profits made on certain contracts against the losses incurred on others. The trustee, on the other hand, argues that the right of equitable subrogation entitles a surety only to reimbursement, not to profits. See Glenn v. American Sur. Co., 160 F.2d 977, 981-82 (6th Cir.1947). Citing Glenn, the district court denied KCIC’s claim of setoff, simply stating that it is not entitled to any profits. KCIC, however, is not seeking profits in the traditional sense. Rather, it is seeking to setoff the profits gained on a few of Larbar’s contracts against even greater losses incurred on other contracts. Glenn, which did not involve setoff, is therefore not controlling.
KCIC claims that § 553 of the Bankruptcy Code allows setoff under the circumstances of this case. Section 553 states that “this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...” (emphasis added). According to this provision, a creditor can offset its losses against its profits when the creditor and debtor have mutual, pre-petition obligations.

1. Mutuality

The first hurdle that KCIC must overcome in order to setoff its losses is to establish mutuality. There are two sets of contracts at issue: the Commonwealth of Kentucky contracts and the Incisa contracts. Larbar entered into numerous contracts directly with the Commonwealth of Kentucky, yielding a net loss of greater than $139,000. Five of those contracts generated a net profit of $3,107.47. Larbar also entered into two contracts as a subcontractor to Incisa. One of the Incisa contracts, the Harlan County project, yielded a net profit of $24,944.89. The other Incisa contract, the Kenton County project, was completed at a net loss of $18,829.31. Overlapping obligations therefore exist between the Commonwealth of Kentucky and Larbar on the one hand and Incisa and Larbar on the other.
Because KCIC, rather than the Commonwealth of Kentucky or Incisa, is the one seeking setoff, it must establish that *446 there is mutuality between it and Larbar in order to take advantage of § 558. Various courts have held that a surety who pays the debts of its principal (here the bankruptcy debtor Larbar) is entitled to step into the shoes of the creditor and assert the creditor’s rights of setoff against the debtor in order to recover the payments that the surety has made. See, e.g., Merritt Commercial Sav. & Loan, Inc. v. Guinee, 766 F.2d 850, 855 (4th Cir.1985); In re Yale Express Sys., Inc., 362 F.2d 111, 114-15 (2d Cir.1966). Accordingly, KCIC is able to step into the shoes of Incisa and the Commonwealth of Kentucky (the creditors) and to assert their rights to setoff the mutual profits and losses on their contracts with Larbar.
Because there were mutual obligations between the Commonwealth of Kentucky and Larbar, and because KCIC can step into Kentucky’s shoes and assert its right of setoff, the mutuality requirement of § 553 as to this set of contracts is satisfied. The issue of mutuality with regard to the Incisa contracts, however, is more complicated and requires further explanation.

a. Joint ventures

The general contractors on the two Incisa contracts were not in fact identical. There were two general contractors on the Harlan County project — Grassetto Construction USA, Inc. and Incisa USA, Inc. The Kenton County project involved only Incisa USA, Inc. For this reason, the trustee argues that mutuality as to these two contracts does not exist.
The two general contractors on the Harlan County project were, however, joint venturers. According to Kentucky law, the mutuality requirement of setoff is met when partners are jointly and sever-ably liable for joint obligations. See Bryant Bros. v. Wilson, 253 Ky. 578, 69 S.W.2d 1020, 1022 (Ky.1934) (holding that “one of two or more joint obligors may set off [the other party’s] joint obligation by the amount of an individual claim due ... them from [the other party]”). Like partners in a partnership, joint ventures are jointly and severably liable for their joint obligations. See Eline Realty Co. v. Foeman, 252 S.W.2d 15, 17 (Ky.1952). Incisa USA, Inc., as a joint venture on the Harlan County project, therefore has mutuality with Larbar to the same extent as if it had been the sole general contractor.

b. State v. federal

The trustee also argues the lack of mutuality on the basis that the Harlan County project was a federal contract, whereas the Kenton County project involved a contract with the Commonwealth of Kentucky. We do not find, however, and the trustee fails to cite, any authority for the proposition that the underlying project owner is a relevant party in determining whether mutuality exists under § 553 between a general contractor and its subcontractor. For this reason, we find immaterial for the purposes of mutuality the fact that one of the projects was a state project and the other was federal. Accordingly, the profit on one of the Incisa contracts and the loss on the other may be offset if the respective obligations arose before Larbar filed for bankruptcy.

%. Pre-petition debts

In order for § 553 to be applicable, the debts must also satisfy the statute’s pre-petition requirement. Two obligations are relevant in this case. First, there are the mutual obligations between the creditors and Larbar. These obligations, which arose in 1990 and 1991 upon the signing of various construction contracts, were clearly established prior to Larbar’s commencement of the bankruptcy proceeding in 1993. Second, there are the obligations between Larbar as the principal and KCIC as its surety. KCIC’s ability to assume the rights of Larbar’s creditors is based upon the doctrine of equitable subrogation. The surety’s rights of equitable subrogation relate back to the date of the bond under which it incurred *447 surety obligations. See Prairie State Nat’l Bank v. United States, 164 U.S. 227, 240, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896); Nat’l Sur. Corp. v. United States, 118 F.3d 1542, 1546 (Fed.Cir.1997). In the present case, KCIC’s issuance of bonds occurred during 1990 and 1991, at least two years prior to the Larbar’s filing of bankruptcy. Because the respective debts are both mutual and pre-petition, § 553 therefore applies.

3. Section 553 is discretionary

Even if a party meets the requirements of § 553, a court is not required to allow a setoff. Rather, setoff “lies within the equitable discretion of the trial court.” In re Southern Indus. Banking Corp., 809 F.2d 329, 332 (6th Cir.1987) (holding that when the debt was incurred by the creditor for the purpose of obtaining a right of setoff against the debtor, the creditor was not entitled to setoff his liability on his note against a debt due him from the debtor under § 553). We therefore review the district court’s decision to disallow setoff for an abuse of discretion. Such an abuse will be found only when we have a “definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.” Taylor v. United States Parole Comm’n, 734 F.2d 1152, 1155 (6th Cir.1984).
In deciding whether or not to grant a creditor’s request for a setoff, the presumption is in favor of setoff, unless such a setoff would prejudice other third-party creditors:
[W]hen equitable grounds exist, such courts allow and permit the set-off defense, if and provided the respective claims may be traced to sources occupying such a relationship toward each other as to create the necessary mutuality at law, and especially will the rule be applied when, on account of insolvency, nonresidence or other recognized causes injustice and loss to the owner of the offset would result if the right was denied, provided that by doing so no legal rights of strangers or third persons are invaded.
Bryant Bros., 69 S.W.2d at 1022; see also Bohack Corp. v. Borden, Inc., 599 F.2d 1160, 1165 (2d Cir.1979) (stating that although the allowance of a setoff is “a decision which ultimately rests in the sound discretion of the bankruptcy court[,]” the Second Circuit “has repeatedly favored the allowance of setoffs.”). In the present case, all of the laborers and materialmen on both Incisa contracts have been paid. Larbar’s only outstanding creditors are general creditors of the estate, such as the Internal Revenue Service, the Division of Unemployment Insurance, and the Commonwealth of Kentucky. Because no legal rights of strangers or third persons will be prejudiced by allowing KCIC a setoff, it is entitled to the presumption that such a setoff is appropriate in this case.
In addition, the policy considerations behind § 553 weigh in favor of allowing KCIC the setoffs in question. A surety is obligated to complete any remaining contracts after its principal defaults. If, however, it is denied the right of setoff, then the surety might be tempted to “cut corners” rather than promptly and properly complete the losing contracts. The opportunity to setoff any profits against its losses on multiple-bonded projects thus serves as a practical incentive for the surety to fulfill all of its obligations. Moreover, if there are no third-party creditors whose legal rights are impaired by the setoff, this incentive in favor of the surety is not at anyone else’s legal detriment. Granting a setoff in such a case, therefore, is not only permissible but desirable to further the policy considerations underlying § 553. We therefore conclude that the district court abused its discretion in not allowing KCIC the setoffs in question.
III. CONCLUSION
For the reasons stated above, we REVERSE the decision of the district court *448 on both the equitable subrogation and set-off issues and REMAND the case for the entry of a judgment consistent with this opinion.